65 F.Supp.2d 853 (1999)
Thomas J. MORIARTY, Trustee on behalf of the Trustees of the Local Union No. 727, I.B.T. Pension Trust, and the Trustees of the Teamsters Local Union No. 727 Health and Welfare Trust, Plaintiff,
v.
CONSOLIDATED FUNERAL SERVICES, INC., d/b/a/ Sheldon-Goglin Funeral Home, Defendant.
Thomas J. Moriarty, Trustee on behalf of the Trustees of the Local Union No. 727, I.B.T. Pension Trust, and the Trustees of the Teamsters Local Union No. 727 Health and Welfare Trust, Plaintiff,
v.
Edgar Funeral Home, Ltd., Defendant.
Nos. 98 C 2025, 98 C 2232.
United States District Court, N.D. Illinois, Eastern Division.
September 23, 1999.
*854 Jacobs, Burns, Sugarman, Orlove & Stanton (Sherrie E. Voyles), Chicago, IL, for Plaintiff.
McKenna, Storer, Rowe, White & Farrug (Lawrence A. Reich), Waukegan, IL, for Defendants.

MEMORANDUM OPINION AND ORDER
KEYS, United States Magistrate Judge.
This matter comes before the Court on Defendants' Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, Defendants' Motion for Summary Judgment is granted.

FACTS

I. Background Facts

Thomas J. Moriarty is a Trustee and a fiduciary for the Local Union No. 727 I.B.T. Pension Trust and the Teamsters Local Union No. 727[1] Health and Welfare *855 Trust ("Funds").[2] (First Amended Complaint [1st Am. Compl.] ¶ 5.) Mr. Moriarty brought this action against Edgar Funeral Home, Ltd. ("Edgar II") and Consolidated Funeral Services, Inc. ("Sheldon II"), pursuant to § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and § 502(a)(3) of ERISA, 20 U.S.C. § 1132(a)(3). (1st Am.Compl.¶ 1.) Mr. Moriarty seeks to compel a payroll audit and the collection of delinquent employer contributions to the Funds, which he alleges are owed by Defendants, Edgar II and Sheldon II. (1st Am.Compl.¶ 1.)
The Funds are third-party beneficiaries of collective bargaining agreements ("CBA[s]") entered into between the Funeral Directors Services Association of Greater Chicago ("FDSA") and the Union. (Plaintiff's Supplemental 12(N) [Pl.'s Supp. 12(N)] ¶ 5; 1st Am. Compl. ¶ 12.) The CBAs provide that each employer member of the FDSA is obligated to contribute to the Funds on behalf of each of its Union employees. (Pl.'s Supp. 12(N) ¶ 6; 1st Am. Compl. ¶ 15.)
Edgar II and Sheldon II are successor companies[3] to Edgar Funeral Home ("Edgar I") and Sheldon-Goglin Funeral Home ("Sheldon I"). (Pl.'s Supp. 12(N) ¶¶ 3, 4; 1st Am. Compl. ¶¶ 7, 9.) Edgar I and Sheldon I were members of the FDSA before they were acquired by David Ruzich and Consolidated Funeral Services, Inc. (Pl.'s Supp. 12(N) ¶ 7; 1st Am. Compl. ¶¶ 17, 29.) As members, Edgar I and Sheldon I authorized the FDSA to negotiate on their behalf with the Union. (Plaintiff's 12(N) Additional Facts Section [Pl.'s 12(N) Addt'l Facts] ¶¶ 1, 12; 1st Am. Compl. ¶¶ 17, 29.) Therefore, Edgar I and Sheldon I were bound by the CBAs, which obligated them to make contributions to the Funds on behalf of Union employees, and allowed for audits of their books. (1st Am.Compl.¶¶ 17, 29.)
On April 3rd and 10th of 1998, Mr. Moriarty filed two separate Complaints; one against Edgar II and one against Sheldon II. On May 19, 1998, the two cases were consolidated into one case. (Defendants' Motion For Summary Judgment [Defs.' Mot. Summ. J.] ¶ 1.) On June 1, 1998, Edgar II and Sheldon II filed a Motion to Dismiss Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and, on October 20, 1998, the Court granted Defendants' Motion to Dismiss ("Opinion"), without prejudice.
Mr. Moriarty then filed a First Amended Complaint on November 6, 1998. Instead of answering, Defendants brought this Motion for Summary Judgment, on December 23, 1998. On February 10, 1999, Mr. Moriarty filed a Memorandum in Opposition to Motion for Summary Judgment, requesting specific discovery. (Plaintiff's Memorandum in Opposition to Motion for Summary Judgment [Pl.'s Mem. Opp.] at 1, 12.) In a Minute Order dated July 19, 1999, the Court granted Mr. Moriarty's requests for discovery.[4] *856 After discovery and pursuant to this Court's July 19, 1999 Order, Mr. Moriarty filed a Supplemental Memorandum in Opposition to Motion for Summary Judgment, on August 9, 1999, and Edgar II and Sheldon II filed a Response to Supplemental Memorandum in Opposition to Motion for Summary Judgment, on August 13, 1999. (Plaintiff's Supplemental Memorandum in Opposition to Motion for Summary Judgment [Pl.'s Supp. Mem. Opp.] at 1-2; Defendants' Response to Supplemental Memorandum in Opposition to Motion for Summary Judgment [Defs.' Resp. to Supp. Mem. Opp.] at 1.)
Specifically, in their Motion for Summary Judgment, Edgar II and Sheldon II claim that, although Mr. Moriarty has sufficiently alleged facts that Sheldon I and Edgar I were bound by their CBAs, he has failed to sufficiently allege that Edgar II or Sheldon II are bound by the substantive provisions of their predecessors' CBAs. (Defs.' Mot. Summ. J. at 4.) Defendants argue that they are not bound by their predecessors' CBAs. (Defs.' Mot. Summ. J. at 3-4.)
Therefore, the issue before this Court is whether, construing the facts in the light most favorable to him, Mr. Moriarty has raised a genuine issue of material fact, as to whether Edgar II and Sheldon II are liable for their predecessors' CBAs. Edgar II and Sheldon II are responsible for such contractual obligations agreed to by their predecessors if they, either explicitly or implicitly, "assumed" the CBAs of their predecessors, or have satisfied the requirements under the "Successorship" doctrine, as outlined by the Seventh Circuit Court of Appeals. This Court's October 20, 1998 Opinion explained that, because the "alter ego" doctrine is not at issue here, the only theories of liability that Mr. Moriarty could prevail on are the "assumption" theory of successor liability or the "Successorship" doctrine. (Opinion at 6-7.)

II. Facts Related to Edgar Funeral Home, Ltd. ("Edgar II")

On November 4, 1992, David Ruzich and his wife, Judith Ruzich, purchased the assets of Edgar Funeral Home ("Edgar I") from Dwight Johnson. (Pl.'s Supp. 12(N) ¶¶ 9, 11.) The subsequent business, Edgar II, "engaged in the same business, is located at the same location, employed the same person,[5] is utilizing the same name and there was no interruption in the operation of the business at the time that Edgar II began to operate the business." (Pl.'s Supp. 12(N) ¶ 3.) (Footnote added).
During negotiations for the sale of Edgar I, Mr. Moriarty asserts that Mr. Ruzich and Mr. Johnson "discussed Edgar's membership in the FDSA and the union obligations flowing therefrom." (Plaintiff's Supplemental 12(N) Additional Facts Section [Pl.'s Supp. 12(N) Addt'l Facts] ¶ 6; Ruzich Deposition [Ruzich Dep.] at 18.) Edgar II, however, states that Mr. Ruzich and Mr. Johnson merely discussed Edgar's membership in the FDSA. (Defendants' Reply to Plaintiff's Supplemental Rule 12N Statement or Defendants' Supplemental 12(M) [Defs.' Supp. 12(M)] ¶ 6.)[6] During these negotiations, Mr. Ruzich and Mr. Johnson also "discussed the wages and benefits paid for, and on behalf of, Edgar I's employee, [Timothy] Landgrebe under the contract between the Union and the FDSA." (Pl.'s Supp. 12(N) Addt'l Facts ¶ 7.) Before the sale of Edgar I, Mr. Ruzich also told "an employee of Edgar I that he did not intend to reduce his wages."[7] (Pl.'s Supp. 12(N) ¶ 8.)
On November 2, 1992, Mr. Landgrebe called Michael Coli, President of the Union, and told him that the funeral home *857 was being sold to Mr. Ruzich. (Pl.'s Supp. 12(N) Addt'l Facts ¶¶ 17, 18.) Mr. Landgrebe also told Mr. Coli that the owner of Edgar I, Mr. Johnson, had told him, "that the sale would not be taking place because [Mr.] Landgrebe was a union member." Id. Mr. Coli then called the funeral home, and spoke with Mr. Johnson and Mr. Ruzich over a speaker phone. (Pl.'s Supp. 12(N) Addt'l Facts ¶ 19.) Mr. Ruzich "did most of the talking." Id. Mr. Coli relayed to Mr. Ruzich what Mr. Landgrebe had said  "that [Mr.] Landgrebe had to quit the union or be fired for the sale to go through." Id. Mr. Coli also told Mr. Ruzich that he thought that "Edgar Funeral Home was under contract and that the sale of the business did not constitute a termination of the contract ...." Id. Mr. Coli called Mr. Ruzich back about forty-five minutes later and asked him if he "wanted to reduce [Mr.] Landgrebe's wages," to which Mr. Ruzich replied "no." (Pl.'s Supp. 12(N) Addt'l Facts ¶ 20; Michael Coli Affidavit [M. Coli Aff.] ¶ 4.) Mr. Coli also asked Mr. Ruzich "if he intended to cut the benefits and he said no he intended to continue the benefit program." Id.
Before the purchase of Edgar II, Mr. Moriarty "advised [Mr.] Ruzich that he believed that Edgar II would be bound by the CBA." (Pl.'s Supp. 12(N) ¶ 9; Moriarty Affidavit [Moriarty Aff.] ¶ 5.) Mr. Moriarty states that Mr. Ruzich did not inform him, prior to purchasing Edgar I, that he did not consider himself to be an FDSA member, nor bound by the CBAs. Id. Mr. Ruzich contests this by alleging that he informed Mr. Moriarty "that he did not think he would be bound and that he did not want to be bound." (Defendants' 12(M) [Defs.' 12(M)] ¶ 9; Defs.' Supp. 12(M) ¶ 8; Ruzich Dep. at 35-36.)
Prior to Edgar II purchasing Edgar I, Mr. Ruzich "discussed" the Union with a "bargaining unit employee." (Pl.'s Supp. 12(N) Addt'l Facts ¶ 25; 1st Am. Compl. ¶ 19.)[8] Prior to the sale date, one "bargaining unit employee" of Edgar I was "told" by Mr. Johnson, the owner of Edgar I, that Edgar II had "agreed to accept" the CBA. (Pl.'s Supp. 12(N) Addt'l Facts ¶ 26.)
The only liability assumed at the time of purchase, on November 4, 1992, was Edgar I's pre-arranged funeral trust fund, which was managed by the FDSA and was one of the benefits of FDSA membership. (Pl.'s Supp. 12(N) ¶ 11; Pl.'s 12(N) Addt'l Facts ¶ 8.) The purchase agreement "specifically excluded all other costs, liabilities, obligations or duties of the seller." (Pl.'s Supp. 12(N) ¶ 11.)
Edgar II was aware at the time of the purchase that Edgar I was a signatory to the CBA and was obligated under that agreement. (Pl.'s Supp. 12(N) Addt'l Facts ¶ 28.) Mr. Ruzich "did not give the FDSA written or verbal notice that he was withdrawing Edgar's membership or from multiemployer bargaining." (Pl.'s Supp. 12(N) Addt'l Facts ¶ 14.) Mr. Ruzich never notified the Union verbally or in writing that he was "terminating" the CBA. (Pl.'s Supp. 12(N) Addt'l Facts ¶¶ 23, 24.)
Shortly after Edgar II took over Edgar I, Mr. Ruzich decided he did not need a full-time employee in Mr. Landgrebe's job, and decided, instead, to have Mrs. Ruzich assist him on a part-time basis. (Pl.'s Supp. 12(N) ¶ 12.) Mr. Ruzich fired Mr. Landgrebe, and did not pay him the severance pay called for in the CBA, "because [Mr.] Ruzich did not consider the company bound by the agreement." Id.
On November 9, 1992, Mr. Coli spoke with Mr. Ruzich, after Mr. Landgrebe told Mr. Coli that he had been fired. (Pl.'s Supp. 12(N) Addt'l Facts ¶ 21.) Mr. Coli told Mr. Ruzich that he owed Mr. Landgrebe severance and vacation pay. Id. Mr. Ruzich disagreed, saying he was "not bound to anything," and that Mr. Coli should talk to his attorney. Id. Mr. Ruzich hung up without giving Mr. Coli the *858 number for his attorney. Id. Mr. Coli tried to call again, but Mr. Ruzich would not take the calls. Id.
Sometime in mid-November of 1992, Mr. Coli called Mr. Moriarty, and said he was filing a "grievance" against "Edgar Funeral Home." (Pl.'s Supp. 12(N) Addt'l Facts ¶ 10.) Mr. Moriarty then called Mr. Ruzich and told him the Union wanted to file a "grievance against Edgar." Id. Mr. Ruzich replied that "he had nothing to do with the Union." Id. Mr. Moriarty also informed Mr. Ruzich that he "believed Edgar II was a member of the FDSA." (Pl.'s Supp. 12(N) Addt'l Facts ¶ 9.) Mr. Moriarty claims that, in this conversation, Mr. Ruzich failed to inform him that Edgar II "was not a member and did not intend to join." (Pl.'s Supp. 12(N) ¶ 14.)
On November 24, 1992, Mr. Coli sent Mr. Ruzich a letter, restating his claims that Mr. Landgrebe "was owed severance pay and vacation pay and some unpaid wages." (Pl.'s Supp. 12(N) ¶ 12; Pl.'s Supp. 12(N) Addt'l Facts ¶ 21.) Mr. Ruzich did not respond, so the Union's attorneys sent Mr. Ruzich another letter, dated January 4, 1993, "complaining of his failure to honor the CBA and threatening legal proceedings." (Pl.'s Supp. 12(N) ¶ 12.) On January 11, 1993, Mr. Ruzich's attorney sent a letter to the Union's attorneys, denying that Edgar II was bound by Edgar I's CBA. Id. On January 21, 1993, Mr. Ruzich's attorney also sent another letter, "reiterating Edgar II's position and citing applicable cases." Id.
On February 8, 1993, the Union filed "unfair labor practice charges" with the National Labor Relations Board ("NLRB") against Edgar II, in which the Union claimed that "Edgar" was refusing to honor the CBA. (Pl.'s Supp. 12(N) ¶ 13.) On March 19, 1993, following an investigation, the NLRB issued its decision finding that "Edgar II was not bound to assume its predecessor's CBA." Id. The Union did not appeal this decision. Id.
Edgar II received bills from the FDSA after it purchased Edgar I. (Pl.'s Supp. 12(N) Addt'l Facts ¶¶ 15, 29.) Mr. Ruzich may have given one or two of the bills to his attorney, but he "mostly just threw them in the garbage." (Pl.'s Supp. 12(N) Addt'l Facts ¶ 15.) Edgar II continued to be listed, for the next year, in the FDSA's annual reference guide as a member in good standing. (Pl.'s Supp. 12(N) Addt'l Facts ¶ 16; Pl.'s 12(N) Addt'l Facts ¶ 7.)
The FDSA manages a pre-arranged funeral trust fund only for its members. (Pl.'s 12(N) Addt'l Facts ¶ 8.) When Edgar II purchased Edgar I, it also acquired the pre-paid funeral funds of Edgar I, and did not remove its money from the FDSA's pre-arranged funeral trust fund "for a period of time."[9] (Pl.'s Supp. 12(N) ¶ 16.) Edgar II explained that it was not able to immediately remove its money from this fund, "because Edgar II had to be licensed and bonded by the state, and also due to the death of the previous owner."[10]Id.
"Edgar II never agreed to join the FDSA and never paid dues to the FDSA." (Pl.'s Supp. 12(N) ¶ 15.) Mr. Ruzich "never attended FDSA meetings or seminars, and never used the FDSA to help the company hire employees." Id. "Edgar II never agreed to be bound by the CBA, and [Mr.] Ruzich never signed any document that would bind the company to the CBA." (Pl.'s Supp. 12(N) ¶ 15.) Mr. Ruzich claims that Edgar II "never applied the terms of the CBA to its employees," other than paying Timothy Landgrebe the same salary that the previous owner paid him. (Pl.'s Supp. 12(N) ¶ 15; Def.'s 12(M) ¶ 15; Ruzich Affidavit [Ruzich Aff.] ¶ 9.) However, Mr. Moriarty denies this allegation, but *859 does not present any contradicting evidence. (Pl.'s Supp. 12(N) ¶ 15.)

III. Facts Related to Consolidated Funeral Services ("Sheldon II")

In February of 1995, Consolidated Funeral Services, Inc. ("Sheldon II"), a corporation owned by Mr. and Mrs. Ruzich and of which Mr. Ruzich is also President, purchased the assets of another funeral home, H.D. Sheldon, Inc. ("Sheldon I"). (Pl.'s Supp. 12(N) ¶ 17.) The subsequent company, Sheldon II, "engaged in the same business, is located at the same location, employed the same person,[11] is utilizing the same name and there was no interruption in the operation of the business at the time that Sheldon II began to operate the business." (Pl.'s Supp. 12(N) ¶ 4.) (Footnote added). The effective date of the agreement was March 31, 1995, the date of closing on Sheldon I's real estate. (Pl.'s Supp. 12(N) ¶ 17.)
Sheldon II was aware at the time of purchase that Sheldon I was a signatory to the CBA. (Pl.'s Supp. 12(N) Addt'l Facts Section ¶ 32.) Mr. Ruzich was informed about Sheldon I's membership by an employee of Sheldon I, Mr. Steinhable, and he also looked up Sheldon I in the FDSA membership directory. Id.
At the purchase, "Sheldon II assumed the seller's interests in pre-paid funerals, but no other liabilities." (Pl.'s Supp. 12(N) ¶ 17.) The seller, H.D. Sheldon, "agreed to satisfy all liabilities ... and agreed that there were no obligations pending or threatened" against him. Id. Mr. Ruzich "did not question" Mr. Sheldon's representation that Sheldon I "is not a party to any pension, retirement, profit sharing, bonus, or option plan for its employees." (Pl.'s Supp. 12(N) Addt'l Facts ¶ 39.)
At the time of the sale, there were "outstanding delinquent contributions, interest and liquidated damages" owed to the Funds for the audit period of January 1, 1992 through March 31, 1995. (Pl.'s Supp. 12(N) Addt'l Facts ¶ 33.) However, at the sale, Mr. Ruzich "was not aware of any outstanding delinquent contributions, interest, or liquidated damages due to the Trust Funds." (Defs.' 12(M) ¶ 21).[12] Mr. Sheldon "did not disclose any such liability to Sheldon II either verbally or in documents." Id. At some time after March 31, 1995, the "delinquent contributions" were paid but the "interest" and "liquidated damages" were not.[13] (Pl.'s Supp. 12(N) Addt'l Facts ¶ 36.)
Mr. Ruzich received a letter dated August 21, 1995, from William Coli, an Administrator of the Funds, stating that Sheldon II was "delinquent in payment of contributions." (Pl.'s Supp. 12(N) ¶ 19.) On August 29, 1995, Mr. Ruzich's attorney wrote back, advising that Sheldon II had no CBA with the Union, and, therefore, no obligation to the Funds. Id. On October 11, 1995, the attorney for the Funds wrote to Mr. Ruzich's attorney, stating that the company was "liable to the [F]unds as a successor." Id. On October 23, 1995, Mr. Ruzich's attorney responded, citing "applicable case law," and "requesting further case law or discussion in order to avoid needless litigation." (Pl.'s Supp. 12(N) ¶ 19.) "Sheldon II heard nothing more from the Trust Funds or their attorneys until this lawsuit was filed...." Id.
After March 31, 1995, the date of purchase, Sheldon II received bills from the *860 FDSA. (1st Am.Compl. ¶ 34.) For the rest of 1995, after the purchase of Sheldon I, Sheldon II was listed in the FDSA's membership book as a member in good standing. (1st Am. Compl. ¶ 38.) Sheldon II did not send a letter to the FDSA "terminating" its membership. (Pl.'s Supp. 12(N) Addt'l Facts ¶ 38.) Sheldon II also did not "notify" the Union, either orally or in writing, "that it did not consider itself bound" by the CBA. (Pl.'s Supp. 12(N) Addt'l Facts ¶ 43.)
On April 4, 1995, Mr. Ruzich received a letter from the FDSA requesting a written "resignation" from this association. (Pl.'s Supp. 12(N) ¶ 18.) The letter indicated that "resignation would take effect upon acceptance by the FDSA Board." Id. Mr. Ruzich did not respond to the letter. Id.
The FDSA manages a pre-arranged funeral trust fund that is available only for members. (Pl.'s 12(N) Addt'l Facts ¶ 8; 1st Am. Compl. ¶ 36.) When Sheldon II purchased Sheldon I, Sheldon II also acquired Sheldon I's pre-paid funeral funds, and Sheldon II did not remove its money from the FDSA's pre-arranged funeral trust fund for "at least three months." (Pl.'s Supp. 12(N) Addt'l Facts ¶ 41.) Sheldon II explains that the money could not be removed immediately, "because Sheldon II had to be licensed and bonded by the state." (Def.'s 12(M) ¶ 22.)[14]
Mr. Ruzich "never paid dues" to the FDSA. (Pl.'s Supp. 12(N) ¶ 20.) Mr. Ruzich "never attended FDSA meetings or seminars and never used the FDSA to help him hire employees." Id. Mr. Ruzich "never agreed to be bound by the CBA, never told anyone the company would agree to be bound and never signed any document which would bind the company to the CBA." Id. "Sheldon II has never applied the terms of the CBA to its employees, and has never been called upon by the Union to do so." Id.

DISCUSSION

I. Standard for Summary Judgment

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The initial burden is on the moving party to identify "those portions of `the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting FED. R. CIV. P. 56(c)). If the moving party meets that burden, the burden shifts to the non-moving party to show, through specific facts in the record, that there is "a genuine issue for trial." Celotex, 477 U.S. at 322-26, 330, 106 S.Ct. 2548; see also Rush v. McDonald's Corp., 966 F.2d 1104, 1109 (7th Cir.1992) (non-moving party then has the burden of providing specific facts to show a genuine issue "open for trial").
Courts will grant summary judgment when the non-moving party, who has the burden of proof at trial, "fail[s] to make a sufficient showing on an essential element of her case...." Celotex, 477 U.S. at 323, 106 S.Ct. 2548. On the other hand, summary judgment is denied if there are "disputes over facts that might affect the outcome of the suit...." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, disputes over facts that are "irrelevant or unnecessary will not be counted." Id. at 248, 106 S.Ct. 2505. The governing substantive law establishes which facts are material. Id. at 248, 106 S.Ct. 2505.
To raise a genuine issue of material fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 *861 L.Ed.2d 538 (1986). Moreover, "mere conclusory allegations" are not enough. Nowak v. St. Rita High Sch., 142 F.3d 999, 1002 (7th Cir.1998). "[A]n adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The non-moving party must present evidence from the record showing that a "genuine issue for trial" exists, such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248-249, 106 S.Ct. 2505.
Usually, the court must construe all facts in the light most favorable to the non-moving party, and may not weigh credibility questions. Anderson, 477 U.S. at 255, 106 S.Ct. 2505. However, pursuant to Northern District of Illinois Local Rule 12(N), failing to contest the moving party's Rule 12(M) statements "is considered a binding admission of those facts." Midwest Imports, Ltd. v. Coval, 71 F.3d 1311, 1313 (7th Cir.1995). Rule 12(N)(3)(a) requires the non-moving party to support disputed facts with "specific references to the affidavits, parts of the record, and other supporting materials relied upon...." N.D. ILL. LOCAL RULE 12(N)(3)(a). The Seventh Circuit has clearly articulated that courts need not "scour the record" in search of evidence supporting the 12(N) claims. Waldridge v. American Hoechst Corp., 24 F.3d 918, 922 (7th Cir.1994). Therefore, all material facts set forth by the moving party "will be deemed to be admitted unless controverted by the statement" of the non-moving party. LOCAL RULE 12(N)(3)(b).

II. Standards for Successor Liability

The Supreme Court and the Seventh Circuit Court of Appeals have frequently faced the question of whether a subsequent company acquires the contractual obligations of its predecessor. See NLRB v. Burns Int'l Sec. Servs., Inc., 406 U.S. 272, 275, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac, 920 F.2d 1323, 1325 (7th Cir.1990); cf. Golden State Bottling Co. v. NLRB, 414 U.S. 168, 170, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973). Courts have imposed such contractual obligations in three types of situations. First, a successor company has been held liable if the court finds that the successor company is the "alter ego" of the predecessor company.[15]Centor Contractors, 831 F.2d at 1312. However, the alter-ego analysis is not at issue here.[16] Second, an obligation to abide by the substantive provisions of a predecessor's collective bargaining agreement can be found if the successor company expressly or implicitly "assumed" such obligations. Burns, 406 U.S. at 284, 92 S.Ct. 1571. Finally, courts have imposed liability on successor companies under the "Successorship" doctrine. Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Tasemkin, Inc., 59 F.3d 48, 49 (7th Cir.1995)(citing Artistic Furniture, 920 F.2d at 1327).
Successor liability is an equitable doctrine, not an inflexible command, and "in light of the difficulty of the successorship *862 question, the myriad of factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially [important]." Howard Johnson Co., Inc. v. Detroit Local Joint Exec. Bd., Hotel and Restaurant Emp. and Bartenders Int'l Union, AFL-CIO, 417 U.S. 249, 256, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974).

A. Assumption Theory[17] of Successor Liability
The Supreme Court and the Seventh Circuit Court of Appeals have held that a successor employer is bound by the substantive provisions of its predecessor's CBA, when the successor company expressly or implicitly assumes that agreement. Burns, 406 U.S. at 284, 92 S.Ct. 1571. This Court recognizes that the test to determine whether a successor company implicitly acknowledged the existence of and "assumed" the obligations of its predecessor's CBA is through a "`consistent pattern of conduct conforming to the terms of the agreement'...."[18]Railroad Maintenance Laborers' Local 1274 Pension, Welfare and Educ. Funds v. Kelly R.R. Contractors, Inc., 591 F.Supp. 889, 896 (N.D.Ill.1984) (quoting Audit Servs., 641 F.2d at 763-64)(concluding that a successor company had implicitly assented to and "assumed" the obligations of the predecessor's CBA by a consistent pattern of conduct conforming to the terms of the CBA). The subsequent company does not become bound by the agreements signed by the predecessor "simply by reason of having succeeded to the business. Liability is based only on a finding that by acts or words, [Defendants] demonstrated [their] willingness to be bound by these agreements." Carter v. CMTA-Molders & Allied Workers Health and Welfare Trust, 563 F.Supp. 244, 247 (N.D.Cal.1983), aff'd, 736 F.2d 1310 (9th Cir.1984).

B. "Successorship" Doctrine
The Seventh Circuit has also "imposed liability upon successors...in a number of different employment-related contexts in order to vindicate important federal statutory policies." Artistic Furniture, 920 F.2d at 1326. One of these employment-related contexts is the "recovery of delinquent multiemployer pension fund contributions" under ERISA. Id. at 1327.
According to the Seventh Circuit's "Successorship" doctrine, a court may find a successor company responsible for its predecessor's liability if: (1) the successor company had notice of the liability before the acquisition; and (2) there was a "substantial continuity in the operation of the business before and after the sale ...." EEOC v. G-K-G, Inc., 39 F.3d 740, 748 (7th Cir.1994); see also Artistic Furniture, 920 F.2d at 1327 (holding successor company liable for predecessor's delinquent pension plan payments where there was substantial continuity between the two companies and successor company had notice of predecessor's liability). The G-K-G Court further stated that "substantial continuity" is satisfied, if no major changes are made in business operations. G-K-G, 39 F.3d at 748.

III. Analysis

Pursuant to § 502 of ERISA, a civil action may be brought by a participant, beneficiary, or fiduciary to enjoin violations of ERISA, as well as to enforce its provisions or terms of a benefit plan. 29 U.S.C. § 1132(a)(3). Mr. Moriarty is seeking enforcement under both § 502 of ERISA, 29 U.S.C. § 1132, and § 301 of LMRA, 29 U.S.C. § 185, in order to obtain access to Defendants' corporate books for an audit, and to receive any contributions allegedly owed.
*863 Mr. Moriarty initially raises the unpersuasive argument that an employer must provide written notice of withdrawal to the Union, or else the employer is liable under a CBA. (Pl.'s Mem. Opp. at 2-4.) However, none of the cases cited by Mr. Moriarty involve successorship liability. Certainly, if Mr. Moriarty was bringing suit against Edgar I or Sheldon I for their failure to withdraw from the FDSA or the CBA, such argument might be persuasive. However, the question here is whether Edgar II and Sheldon II, neither a signatory to the original CBAs, are nevertheless responsible for the contractual obligations under the assumption theory of liability or the Successorship doctrine.

A. Analysis Under the Assumption Theory of Successor Liability

1. Edgar II
Mr. Moriarty attempts to bypass the assumption theory of successor liability by arguing that, because Edgar I was a member of the FDSA and bound by the CBA, Edgar II is, therefore, a member of the FDSA and bound by the same agreement. (Pl.'s Mem. Opp. at 5-6.) However, in order to show that Edgar II "assumed" its predecessor's CBA by virtue of its membership in the FDSA, Mr. Moriarty must first prove that Edgar II was, in fact, a member. Mr. Moriarty cites to the First Amended Complaint to support his proposition that Edgar II was a member, but under Rule 56(e), a party may not rest on mere conclusory allegations made in its pleadings. (Pl.'s Mem. Opp. at 5; 1st Am. Compl. ¶¶ 22-26.)
Mr. Moriarty argues that, because the FDSA continued to list Edgar II as a member in good standing in its annual reference guide, Edgar II did not remove its money from the FDSA's pre-arranged funeral trust fund for a period of time, and Edgar II never sent a letter of resignation to the FDSA, that Edgar II thus was a member of the FDSA. (Pl.'s Mem. Opp. at 6; Pl.'s Supp. 12(N) Addt'l Facts ¶ 16; Pl.'s Supp. 12(N) ¶ 16; Moriarty Aff. ¶ 12.) While these facts are undisputed, such unilateral actions by the FDSA do not establish Edgar II's membership. As Defendants point out, "How can someone who was never a member of some organization become one by failing to resign?" (Defendants' Reply Brief in Support of Motion for Summary Judgment [Defs.' Reply Brief] at 6.) As Mr. Moriarty's Affidavit states at ¶ 2:
An employer becomes a member of the FDSA by filing an application for membership which includes the name of the funeral home, the address, the owner's name and the license number of funeral director. The application is presented to the Board of Directors and voted upon. After the member is accepted into the FDSA they just keep paying dues.
There is absolutely no evidence that Edgar II undertook any of these requirements, in order to obtain membership in the FDSA. On the other hand, it is undisputed that Edgar II never agreed to join the FDSA, never paid dues or utilized any of the FDSA's services to hire employees, never attended any FDSA meetings or seminars, and never signed any document binding Edgar II to the CBA. (Pl.'s Supp. 12(N) ¶ 15.) Therefore, Edgar II never was a member of the FDSA, nor bound by the CBA.
Not only was Edgar II never a member bound by the CBA, but Edgar II never "assumed" the responsibilities of Edgar I with the FDSA and under the CBA. In fact, Mr. Ruzich, the subsequent owner of Edgar II, constantly refused to become a member of the FDSA and to be bound by the CBAs. Mr. Ruzich did not demonstrate a "consistent pattern of conduct conforming to the terms of the agreement," as required under Railroad Maintenance, 591 F.Supp. at 896 (quoting Audit Servs., 641 F.2d at 763-64). Instead, the facts demonstrate that Mr. Ruzich vigorously refused to be recognized as an FDSA member or to be bound by the CBA.
Mr. Moriarty claims that, in this case, there are five facts in dispute. However, *864 these five matters do not present a genuine issue of material fact, because they are either irrelevant or mere conclusory allegations not supported by evidence.
First, Mr. Moriarty alleges that, before November 4, 1992, the date on which Edgar II purchased Edgar I, Mr. Ruzich informed Michael Coli that he did not want to "reduce [Mr.] Landgrebe's wages" and he "intended to continue the benefit program." (Pl.'s Supp. 12(N) Addt'l Facts ¶ 20; M. Coli Aff. ¶ 4.) This fact is irrelevant, because even if true, it would not show that Edgar II was liable for the predecessor's CBA, since there is no evidence in the record that Mr. Ruzich took any action towards continuing any of the benefits or "assuming" the responsibilities of Edgar I under the CBA. It is also unclear which benefits he was referring to. Mr. Moriarty provides no definition of "benefit program."
Second, Mr. Moriarty claims that Mr. Ruzich failed to inform him, prior to purchasing Edgar I, that he did not consider himself to be an FDSA member, nor bound by the CBAs. (Pl.'s Supp. 12(N) ¶ 9; Moriarty Aff. ¶ 5.) Mr. Ruzich contests this by alleging that he informed Mr. Moriarty "that he did not think he would be bound and that he did not want to be bound." (Defs.' 12(M) ¶ 9; Defs.' Supp. 12(M) ¶ 8; Ruzich Dep. at 35-36.) Notwithstanding the dispute, the fact is irrelevant. Since Edgar II itself was not an FDSA member, Mr. Ruzich had no duty to inform Mr. Moriarty of anything.
Third, Mr. Moriarty asserts that, after the purchase, Mr. Ruzich failed to inform him that Edgar II "was not a member of the FDSA and did not intend to join." (Pl.'s Supp. 12(N) ¶ 14.) According to Mr. Moriarty, Mr. Ruzich did not give the FDSA verbal or written notice that he was "withdrawing." (Moriarty Aff. ¶ 10.) This fact is also irrelevant. Once again, Mr. Ruzich did not have a duty to withdraw, since he never was a member of the FDSA.
Fourth, Mr. Moriarty denies the claim of Edgar II that it "never applied the terms of the CBA to its employees," other than paying Mr. Landgrebe the same salary that the previous owner paid him. (Pl.'s Supp. 12(N) ¶ 15; Def.'s 12(M) ¶ 15; Ruzich Aff. ¶ 9.) This fact is a mere conclusory allegation. Mr. Moriarty must set forth more specific facts and present further evidence, to raise a genuine issue of material fact.
Finally, Mr. Moriarty claims that, during negotiations, Mr. Ruzich and Mr. Johnson "discussed Edgar's membership in the FDSA and the union obligations flowing therefrom." (Pl.'s Supp. 12(N) Addt'l Facts ¶ 6; Ruzich Dep. at 18.) Edgar II denies this allegation, stating that Mr. Ruzich and Mr. Johnson merely discussed "Edgar's" membership in the FDSA. (Defs.' Supp. 12(M) ¶ 6.) This allegation is irrelevant. Even if Mr. Moriarty's allegation is true, there is no evidence in the record to show that Mr. Ruzich took any action to assume any "discussed" union obligations.
Therefore, Mr. Moriarty has failed to raise a genuine issue of material fact, in relation to the allegation that Edgar II explicitly or implicitly "assumed" the responsibilities of its predecessor, Edgar I, with regards to the FDSA or the Union.

2. Sheldon II
As to Sheldon II, Mr. Moriarty again attempts to bypass the assumption theory of successor liability by arguing that, because Sheldon I was a member of the FDSA and bound by the CBA, Sheldon II was, therefore, a member of the FDSA and bound by the same agreement. (Pl.'s Mem. Opp. at 4-5.) However, in order to show that Sheldon II "assumed" its predecessor's CBA by virtue of its membership in the FDSA, Mr. Moriarty must first prove that Sheldon II was, in fact, a member. Mr. Moriarty again cites the First Amended Complaint to support the proposition that Sheldon II was a member, but under Rule 56(e), a party may not rest on mere conclusory allegations made in its pleadings. (Pl.'s Mem. Opp. at 5; 1st Am. Compl. ¶¶ 33-38.)
*865 The facts that the FDSA continued to list Sheldon II as a member in good standing in its annual reference guide, Sheldon II did not remove its money from the FDSA's pre-arranged funeral trust fund for a period of time, and Sheldon II never sent a letter of resignation to the FDSA, do not establish Sheldon II was a member of the FDSA. (1st Am. Compl. ¶ 38; Pl.'s Supp. 12(N) Addt'l Facts ¶¶ 38, 41.) While these facts are undisputed, such unilateral actions by the FDSA do not establish Sheldon II's membership.
Just as this Court found in the case of Edgar II, there is absolutely no evidence that Sheldon II undertook any of the requirements to obtain membership in the FDSA. On the contrary, Sheldon II never paid dues to the FDSA, never utilized any of the FDSA's services to hire employees, never attended any FDSA meetings or seminars, never agreed to be bound by the CBA, never told anyone that the company would agree to be bound, never signed any document binding Sheldon II to the CBA, and never applied the terms of the CBA to its employees. (Pl.'s Supp. 12(N) ¶ 15.) Sheldon II was never a member bound by the CBA, and Sheldon II never "assumed" the responsibilities of Sheldon I with the FDSA and under the CBA. In fact, Mr. Ruzich again refused at all times to become an FDSA member and to be bound by the CBA.
Therefore, Mr. Moriarty has failed to raise a genuine issue of material fact in relation to the allegation that Sheldon II explicitly or implicitly "assumed" the responsibilities of its predecessor, Sheldon I, with regards to the FDSA or the Union.

B. Analysis Under the "Successorship" Doctrine

1. Edgar II
Mr. Moriarty claims that Edgar II is a "successor" of Edgar I, according to the Seventh Circuit Court of Appeals' "Successorship" doctrine. While he fulfills the second part of the test, because there was a "substantial continuity" in the operation of the business after the sale,[19] Mr. Moriarty has failed to provide facts (or raise any genuine issue of material fact) that supports the first part of the test  that Edgar II had notice before the acquisition that it would be liable to the Funds under Edgar I's CBA.
Edgar II was aware, at the time of the purchase that Edgar I was a signatory to the CBA and was obligated under that agreement. (Pl.'s Supp. 12(N) Addt'l Facts ¶ 28.) However, the only liability that Edgar II had notice of at the time of the purchase was Edgar I's pre-arranged funeral trust fund obligation. (Pl.'s Supp. 12(N) ¶ 11.) This money in the FDSA prearranged funeral trust fund, which Edgar II removed after the sale, was the only connection or obligation that Edgar II knowingly inherited from Edgar I and for which Edgar II knew it was responsible. The purchase agreement specifically excluded all other costs, liabilities, obligations, or duties of the seller. Id. Therefore, Edgar II had no notice of any liability under the FDSA or CBA.
Thus, Mr. Moriarty has failed to raise a genuine issue of material fact, regarding the claim that Edgar II was a successor to Edgar I according to the "Successorship" doctrine.

2. Sheldon II
Mr. Moriarty also claims that Sheldon II is a "successor" according to the Seventh Circuit Court of Appeals' "Successorship" doctrine. Similarly, his case fulfills the second part of the test, because there was a "substantial continuity" in the operation of the business after the sale,[20] but Mr. *866 Moriarty has failed to raise any genuine issue of material fact regarding the first part of the test  that Sheldon II had notice before the acquisition that it would be liable to the Funds under Sheldon I's CBA.
Like Edgar II, Sheldon II was aware, at the time of the purchase that Sheldon I was a signatory to the CBA and was obligated under that agreement. (Pl.'s Supp. 12(N) Addt'l Facts ¶ 32.) However, the only liability or obligation that Sheldon II had notice of at the time of the purchase was the FDSA's pre-arranged funeral trust fund. (Pl.'s Supp. 12(N) ¶ 17.) Sheldon's money in the FDSA pre-arranged funeral trust fund, which Sheldon II removed after the sale, was the only connection or obligation that Sheldon II knowingly inherited from Sheldon I and for which Sheldon II knew it was responsible. During negotiations, the seller, Mr. Sheldon, agreed to satisfy all liabilities and also agreed that there were no obligations pending or threatened against him. (Pl.'s Supp. 12(N) ¶ 17.)
In the case of Sheldon II, however, at the time of the purchase, there were "outstanding delinquent contributions, interest, and liquidated damages" owed to the Funds for the audit period of January 1, 1992 through March 31, 1995. (Pl.'s Supp. 12(N) Addt'l Facts ¶ 33.) However, Mr. Ruzich was unaware of these liabilities at the time of the purchase. (Defs.' 12(M) ¶ 21.) Mr. Sheldon did not disclose any such liability to Sheldon II, either verbally or in writing. Id. Therefore, Edgar II had no notice of any liability under the FDSA or CBA.
Thus, Mr. Moriarty has failed to raise a genuine issue of material fact, regarding the claim that Sheldon II was a successor to Sheldon I according to the "Successorship" doctrine.

CONCLUSION
Mr. Moriarty has failed to raise a genuine issue of material fact, regarding Edgar II's and Sheldon II's liability as successors. Additionally, Edgar II and Sheldon II have demonstrated that they neither "assumed" the CBA's responsibilities of their predecessors, nor were successors under the Seventh Circuit's "Successorship" doctrine. Therefore, because no genuine issue of material fact exists, Defendants Edgar II and Sheldon II are entitled to judgment as a matter of law.[21]
IT IS THEREFORE ORDERED that:
Edgar II's and Sheldon II's Motion for Summary Judgment be, and the same hereby is, GRANTED.
NOTES
[1] Local 727's full name is the "Auto Livery Chauffeurs, Embalmers, Funeral Directors, Apprentices, Ambulance Drivers and Helpers, Taxicab Drivers, Miscellaneous Garage Employees, Car Washers, Greasers, Polishers and Wash Rack Attendants Union, Local No. 727, I.B.T." ("Union"). (1st Am.Compl.¶ 12.)
[2] The Funds are employee benefit plans, within the meaning of § 3 of the Employee Retirement Income Security Act ("ERISA"), 20 U.S.C. § 1002(3). (1st Am.Compl.¶ 4.)
[3] The fact that this Court is referring to Edgar II and Sheldon II as "successor" companies does not mean that they have "assumed" the responsibilities of their predecessors under the CBAs or are considered "successors" under the Seventh Circuit's "Successorship" Doctrine.
[4] In its July 19, 1999 Order, this Court stated: "In considering the pending motion for summary judgment, the Court has discovered that Plaintiff asserts it is unable to properly defend itself against the motion without: 1) getting copies of the entire `buy-sell' agreement between Edgar I and Edgar II and the entire `buy-sell' agreement between Sheldon I and Sheldon II and 2) deposing Mr. Ruzich. Accordingly, Defendants are directed to supply the entire `buy-sell' agreements to Plaintiff by 7/26/99. Further, Plaintiff is given leave until 8/2/99 to depose Mr. Ruzich. Plaintiff then has until 8/9/99 to supplement its response to the motion for summary judgment and 12(n) statement. Defendants have until 8/12/99 to respond."
[5] Edgar II continued to employ Mr. Timothy Landgrebe, an employee of Edgar I, after the purchase of Edgar I.
[6] There are two ¶ 6's in Defs.' Supp. 12(M). This Court is referring to the second ¶ 6.
[7] Mr. Moriarty has failed to identify the employee in question. However, Mr. Moriarty might be referring to Timothy Landgrebe, the only employee of Edgar I and II mentioned in the record.
[8] Edgar II only "admit[s]" this fact for the purpose of this motion. (Defs.' Supp. 12(M) ¶ 25.) Mr. Moriarty has merely pled this fact in the First Amended Complaint, and has not presented any evidence to support this allegation.
[9] The money in the pre-arranged funeral trust fund is the only liability of Edgar I, disclosed by Mr. Johnson and assumed by Edgar II, at the time of purchase, on November 4, 1992.
[10] From this fact in the record, the Court assumes that Mr. Johnson, the owner of Edgar I, died between the sale of Edgar I and the date on which Edgar II removed its money from the FDSA's pre-arranged funeral trust fund. No more information is given regarding Mr. Johnson's death.
[11] After the purchase, Sheldon II employed the same individual, James Steinhable, to do the funeral directing as had been employed by Sheldon I. (Pl.'s Supp. 12(N) Addt'l Facts ¶¶ 32, 42.)
[12] Mr. Moriarty disagreed with this fact (Pl.'s 12(N) ¶ 21), and requested discovery to obtain additional information. However, after discovery, Mr. Moriarty completely failed to address this fact. (Pl.'s Supp. 12(N) ¶ 21.) Therefore, since Mr. Moriarty has failed to respond and present any contradicting evidence, this fact is deemed admitted.
[13] Both Mr. Moriarty and Sheldon II have failed to mention or establish who paid the outstanding delinquent contributions. Therefore, the Court must assume that this fact is not relevant to the case.
[14] Mr. Moriarty has not contradicted this reason with another, nor has he presented any evidence contrary to this fact. (Pl.'s Supp. 12(N) ¶ 22.)
[15] If a successor company is an "alter ego" of its predecessor company, as a matter of law, the successor is liable and bound by the substantive provisions of the collective bargaining agreement signed by its predecessor. Chicago Dist. Council of Carpenters Pension Fund v. Vacala Masonry, Inc., 967 F.Supp. 309, 311 (N.D.Ill.1997). The alter-ego doctrine focuses on "`the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement....'" International Union of Operating Eng'rs, Local 150 AFL-CIO v. Centor Contractors, Inc., 831 F.2d 1309, 1312 (7th Cir.1987) (quoting Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 24 (1st Cir.1983)).
[16] Mr. Moriarty does not allege, in his First Amended Complaint and pleadings, that Defendants are alter egos of their predecessor companies, nor does he allege facts that would suggest that Edgar II and Sheldon II were alter egos of their predecessors. Therefore, analysis of liability under the "alter-ego" doctrine is unnecessary.
[17] The assumption theory is not a term of art; rather it is used by this Court merely in the context of this case.
[18] An example of such an assumption would be where the subsequent company continues to contribute to the pension funds. See Audit Servs., Inc. v. Rolfson, 641 F.2d 757, 763-64 (9th Cir.1981).
[19] It is uncontested that there was a substantial continuity in the operation of the business after the sale, since there were no major changes made to the business or its operations. (Pl.'s Supp. 12(N) ¶ 3.)
[20] It is uncontested that there was a substantial continuity in the operation of the business after the sale, since there were no major changes made to the business or its operations. (Pl.'s Supp. 12(N) ¶ 14.)
[21] Their request for costs and attorney's fees is hereby denied.